(104 So. 656)

KILPATRICK v. STATE.    (4 Div. 136.)

(Supreme Court of Alabama.    May 14, 1925. Rehearing Denied June 18, 1925.)

1. Indictment and information ☞7—Return of indictment by previously organized grand jury after recess held in accord with statute.

Return of indictment, on day previously organized grand jury was called into session after recess subject to court's order, *held* in accord with Code 1923, § 8665.

**2. Homicide ⊜⇒158(3)—Conditional threats against deceased, and expressions of ill will toward unnamed person, held admissible.**

Evidence of threats and expressions of ill will by defendant against deceased *held* admissible in murder prosecution, though one threat was conditional and other directed against unnamed person.

**3. Homicide ⊜⇒174(8)—Testimony as to defendant's expression of hostility toward policeman, wounded by him shortly after killing deceased, held admissible.**

Sheriff's testimony that defendant's first remark, after being taken into custody few minutes after killing deceased and wounding policeman few moments later, that latter was one he wanted, *held* admissible as showing hostility to policeman and enabling jury to properly characterize act.

**4. Criminal law ⊜⇒464—Testimony that defendant's case was as bad as any sheriff ever had held not admissible on issue of insanity.**

Sheriff's testimony that defendant's case was as bad as any he ever had in jail was not admissible on issue of insanity; only proper question being whether defendant understood nature of act, or was unable to refrain from committing it.

**5. Criminal law ⊜⇒452(2)—Sheriff's opinion as to defendant's sanity held admissible.**

In murder trial, sheriff, who had defendant in custody for some time, was properly allowed to state opinion that defendant was sane at time of trial, and had been since return from insane hospital, to which committed shortly after killing; probative force thereof on issue on insanity being for jury.

**6. Homicide ⊜⇒175—Undertaker's testimony as to location and depth of deceased's wounds held admissible.**

Testimony of undertaker, who, with physician, probed deceased's wounds, as to location and depth thereof, *held* admissible.

**7. Criminal law ⊜⇒466—State held properly allowed to show, on cross-examination, that witness, testifying as to defendant's insanity, had pleaded insanity in case against him.**

Where defendant's witness, who was in jail at same time as defendant, and helped jailer care for him after shooting, testified that defendant was foolish and crazy, state was properly permitted to show, on cross-examination of witness, that he had pleaded insanity in his own case.

**8. Homicide ⊜⇒338(4)—Permitting proof, as to charge on which defendant's witness was confined in jail, held cured by instruction to disregard testimony.**

Error, if any, in permitting state to show on what charge witness, testifying to defendant's insanity while in jail after killing, was confined therein, *held* cured by court's clear instruction to jury on next day to disregard such testimony, in view of its relative unimportance.

**9. Criminal law ⊜⇒419, 420(10)—Evidence that witness mentioned defendant's erratic behavior to his wife held inadmissible as hearsay.**

In murder prosecution, wherein defendant pleaded insanity, his offer to show that witness, testifying to his erratic behavior on certain occasion, afterwards mentioned circumstance to his wife, was properly excluded as hearsay.

**10. Criminal law ⊜⇒466—Cross-examination of insanity witness as to whether defendant transacted business correctly held permissible.**

Cross-examination of witness, testifying to defendant's insanity, as to whether defendant transacted business with witness in correct way, *held* permissible.

**11. Criminal law ⊜⇒485(2)—Hypothetical question to physician as to defendant's mental state held properly disallowed.**

Hypothetical question to physician as to defendant's mental state *held* properly disallowed, in murder case, as not fairly hypothesizing facts in evidence, and inviting witness' judgment that defendant was insane at time of killing because another physician had so testified.

**12. Criminal law ⊜⇒390—Question, on direct examination of witness, as to why he did not sleep, held properly excluded.**

Defendant's question to witness, on direct examination, "Why didn't you sleep?" *held* properly excluded, as calling for statement of uncommunicated motives, purposes, and mental operations, and of trifling importance.

**13. Criminal law ⊜⇒451(1)—Physician's testimony that defendant tried to escape from insane hospital held competent.**

Testimony of physician, connected with insane hospital while defendant was confined there after killing, that he tried to escape, *held* competent statement of collective fact.

**14. Criminal law ⊜⇒1169(2)—Testimony as to defendant's attempt to escape from insane hospital held not ground for reversal.**

Testimony of physician, connected with insane hospital while defendant was confined there, that he tried to escape, *held* not ground for reversal, where facts fully justifying witness were stated by him and other witnesses, and not denied.

**15. Criminal law ⊜⇒479—Physician held properly allowed to give opinion that defendant was feigning insanity.**

Physician, who was expert on insanity, and had observed defendant for some months while in insane hospital after killing, was properly allowed to give opinion that he was feigning insanity.

**16. Criminal law ⊜⇒452(2)—Physician's testimony that defendant was not insane when he visited him in jail held competent.**

In murder trial, it was competent for physician, who knew defendant and visited him in jail, to state opinion that he was not insane on such occasion.

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**17. Homicide ☞179—Testimony of defendant's fellow employee as to book entries by defendant on day of homicide held admissible.**

In murder trial, wherein defendant pleaded insanity, testimony of fellow employee of defendant in deceased's business, as to defendant's duties and manner of discharging them, and his having made number of book entries, evidencing transactions by him, on 'day of homicide, held admissible.

**18. Homicide ☞179—Refusal to limit testimony of defendant's fellow employee to issue of insanity vel non held not error.**

In murder trial, refusal to 'limit testimony of fellow employee of defendant as to defendant's duties, manner of discharging them, etc., to issue of insanity vel non, held not error, where there was no other real issue in cause, and it did not appear that limitation would have been more than useless ceremony, or of any possible benefit to defendant.

**19. Witnesses ☞407—Evidence tending to show witness' presence in deceased's store on day of killing therein held admissible to rebut evidence to contrary.**

Where° defendant introduced evidence that witness, who testified that he saw killing, was not in city or deceased's store, where killing occurred, on day thereof, state was properly permitted to show that he received order on deceased for merchandise on such day, and that order was kept on deceased's file, and filled day after his burial, when store was reopened.

**20. Criminal law ☞683(3)—Evidence that another performed antics attributed to defendant, as showing unsettled state of mind, held admissible.**

Where defense introduced evidence of antics by defendant in barber shop, as showing unsettled state of mind, it was competent for state to show in rebuttal that defendant's brother was one who engaged in such performances.

**21. Criminal law ☞721(6)—Prosecutor's reference to defendant's failure to tell jury whether state's witness was present at homicide held error.**

Reference by state's counsel to fact that defendant did not tell jury whether state's eyewitness was present at homicide held error, as calling attention to defendant's failure to testify in his own behalf, in violation of Code 1923, § 5632.

**22. Criminal law ☞730(10)—Counsel's reference to defendant's failure to testify held not reversible error.**

Prosecuting counsel's reference to fact that defendant did not tell jury whether state's eyewitness was present at homicide held not reversible error, where court told jury that argument was improper and should be given no weight.

**23. Criminal law ☞773(2)—Charge to acquit, if defendant had disease of mind or was "otherwise insane," held too broad.**

Charges to acquit defendant, if afflicted with disease of mind or "otherwise insane" ' at time of homicide, held properly refused, as broadening area of nonresponsibility without defining limits.

**24. Homicide ☞27—Insanity must be result of mental disease to excuse homicide.**

Insanity must be result of mental disease to excuse homicide, unless defendant is wholly incapable of distinguishing between right and wrong as to particular act.

**25. Homicide ☞27—Momentary, emotional, or moral insanity' no excuse.**

Momentary, emotional, or moral 'insanity, not associated with mental disease, is no excuse for homicide.

**26. Homicide ☞294(½)—Refused charge held misleading, as tending to create impression that defendant might be acquitted on ground of drunkenness only.**

Refused charged that, if defendant was insane from time of killing until shortly before trial, and intoxicated at time of killing to extent that he did not know what he was doing, presumption was justified that he was insane at time of killing, to extent that he did not know right from 'wrong, or was unable to choose between them, held misleading as tending to create impression ·that he might be acquitted on ground of drunkenness only.

**27. Homicide ☞28—Defendant's drunkenness no excuse.**

That defendant was drunk at time of homicide would not excuse his act.

**28. Criminal law ☞814(10)—Charges as to defendant's drunkenness held properly refused, in view of evidence that he was only slightly intoxicated.**

Charges that, if jury believed testimony, defendant was drunk at time of alleged threats of violence against deceased, and "crazy drunk" shortly before and at time of alleged shooting, held properly refused, in view of evidence warranting finding that he was only slightly under influence of intoxicant.

**29. Homicide ☞174(8), 179—Shooting of, and remarks concerning, policeman shortly after killing of deceased held competent, as illustrating defendant's state of mind at time of homicide.**

Shooting of policeman by defendant immediately after killing deceased, and defendant's remark a few minutes later that policeman was one he wanted, held competent for jury's consideration, as illustrating defendant's state of mind when shooting deceased, as well as on question of insanity.

**30. Criminal law ☞327—State not required to prove witness' presence at scene of homicide by other than his own testimony.**

There was no specific burden on state to prove that witness, testifying that he saw killing, was on scene of homicide, by other than his 'own testimony.

**31. Criminal law ☞829(1)—Refusal of charge, fairly covered by oral charge, not error.**

Refusal of charge, fairly covered by court's oral charge, is not error.

---

**32. Criminal law ⬤═779(18)—Refusal of charge to acquit in case of doubt, arising from question whether alleged eyewitness was present at time and place of killing, held not error.**

Refusal of charge to acquit, in case of reasonable doubt, arising from question whether one claiming to have witnessed killing was present at time and place thereof, *held* not error, in view of other testimony warranting conviction.

**33. Homicide ⬤═80 — Drunkenness not insanity nor excuse for crime.**

Drunkenness is not insanity nor excuse for crime, even if defendant was "crazy drunk," though drunkenness so excessive as to paralyze mental faculties and render one incapable of premeditation or malice may reduce homicide from murder to manslaughter in extreme cases.

Appeal from Circuit Court, Covington County; W. L. Parks, Judge.

Burl Kilpatrick was convicted of murder in the first degree, and he appeals. Affirmed.

The witness Hicks testified that about a month before the killing he heard deceased say to defendant that he (defendant) seemed to be drinking a right smart, and that, just after deceased left, witness heard defendant say, "If I had my pistol, I would kill the ―――― and get through with him to-day."

Witness Turner testified that just before the shooting defendant came into the place where witness was working and said, "You know, there is a bunch been talking about me; * * * I am going to kill some ―――― if he doesn't let my business alone;" that defendant turned and walked out, but came back again and said, "I am going up town to do just exactly what I told you I was going to do;" that witness asked defendant whom he had reference to, and defendant replied that it did not make any difference, and that "you will hear from me in a short time."

Defendant propounded to his witness, Dr. Underwood, the following question, the state's objection to which was sustained:

"Assuming that Dr. Ray had made some 40 odd visits to see Mr. Kilpatrick, while he was in jail, from May 13th till September 26th, of last year, and has observed him and treated him, and that he has been his family physician for some 10 or 12 years preceding that time, and that he has on numerous occasions treated him for syphilis, not over a period of 10 years next preceding the time Mr. Knox was killed, and that he has visited him some 3 weeks before Mr. Knox was killed, and assuming that Dr. Ray had testified in this case that defendant was insane, and in his judgment was afflicted with what you call a syphilitic spine, and that he had been sent to Hot Springs for treatment, and if Dr. Ray had testified that the man, while he was in jail, was of unsound mind, and that about 3 weeks preceding the time Mr. Knox was killed that he

(Dr. Ray) was called to attend him, and that he appeared then, in his judgment, to be of unsound mind, and that from time to time he had complained to him and discussed with him the case of syphilis that he had been afflicted with, and was afraid that it had been causing his troubles from time to time, and that other witnesses, including the sheriff of the county, had testified that the defendant was insane, and that other witnesses had testified that before Knox was killed the defendant was insane, and there was testimony also tending to show that a short while before the killing the defendant was crazy, that he did not know what he was doing or talking about, then in your judgment, assuming those facts to be true, and from what you know of this defendant, would you say that he was a man of unsound mind?"

These charges were refused to defendant:

"(20) The court charges the jury that, if you believe the testimony, the defendant was drunk at the time he is alleged to have made the threats of violence testified to by the state's witness Hicks."

"(21) The court charges the jury that, if you believe the testimony, the defendant was crazy drunk shortly before the alleged shooting when with the witness Turner."

"(22) The court charges the jury that, if you believe the testimony, the defendant was crazy drunk at the time of the alleged shooting of the deceased, John L. Knox."

"(26) The court charges the jury that the testimony as to the shooting of J. N. Jernigan by the defendant is only to be considered by you, in connection with all the other testimony, on the question of the mental condition of the defendant, and not as to the alleged charge of the murder of John L. Knox, deceased."

"A2. The court charges the jury that in the case you must not consider any assault that defendant may have made on J. N. Jernigan as to any alleged assault which the defendant may have made on John L. Knox, deceased."

"A. The court charges the jury that if, from all the testimony, you are reasonably satisfied that the witness Claude Coursey, for the state, has testified willfully false in this case, as to his being in the store of J. L. Knox & Co., at the time of the killing, the burden in the case being on the state to show that he was at that place at that time, then you will be justified in discarding all the testimony of such witness altogether, as to all facts testified to by him in the case."

"A1. The court charges the jury that if, from a consideration by you of all the testimony, should any member of the jury have a reasonable doubt of the guilt of the defendant arising out of any fact as to whether Claude Coursey was present at the time and place of the killing, you cannot find the defendant guilty of any offense in the case."

"A7. The court charges the jury that if, from the testimony and facts in evidence, you are reasonably satisfied that the defendant was drunk at the time that John L. Knox was killed, that at and immediately before the time of such killing the defendant was crazy drunk to the extent that he would not know what he was then talking about, and that such con-

---

⬤═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

dition had been proximately the result of indulgence in the use of alcoholic beverages or intoxicating like beverages, then you may be justified in finding that the defendant, at the time of the killing, was of unsound mind, and did not know right from wrong, or, if knowing, that he was unable, from the impelling force of his defective mental condition, to choose between the right and wrong, and thus find the defendant not guilty on his plea of insanity."

"(8) The court charges the jury that if, from a consideration of the testimony, you are reasonably satisfied that the defendant was insane from the time of the killing of the deceased until shortly before the trial of the cause, that the type of insanity was of a prolonged and severe type, and that at the time of the killing the defendant was intoxicated to the extent that he did not know what he was doing and would not know what he was talking about, that he had been adjudged insane by judicial order and sent to .the Alabama Insane Hospital of Alabama, at Tuscaloosa, Ala., where he remained for several months, when considered with all the other testimony, then such facts are sufficient to justify the presumption that the defendant was, at the time of the killing, insane or of unsound mind to the extent that he did not know right from wrong, or, knowing, that he was unable, from the impelling force of such, to choose as between right from wrong."

A. Whaley and E. O. Baldwin, both of Andalusia, for appellant.

The charges upon insanity were improperly refused. Odom v. State, 174 Ala. 4, 56 So. 913; 32 C. J. 761. The comment by counsel for the state, in argument to the jury, upon defendant's failure to testify, · was good ground for granting the motion for a new trial. Code 1907, § 7894; Const. 1901, § 6; Nunn v. State, 19 Ala. App. 619, 99 So. 738; Metropolitan v. Carter, 212 Ala. 212, 102 So. 130; Cassemus v. State, 16 Ala. App. 61, 75 So. 267; Bestor v. State, 209 Ala. 693, 96 So. 899; Anderson v. State, 209 Ala. 36, 95 So. 171; May v. State, 209 Ala. 72, 95 So. 279; B. R., L. & P. Co. v. Drennen, 175 Ala. 349, 57 So. 876, Ann. Cas. 1914C, 1037; Cross v. State, 68 Ala. 485; Florence Co. v. Field, 104 Ala. 471, 16 So. 538; Jackson v. State, 45 Fla. 38, 34 So. 243, 3 Ann. Cas. 164.

Harwell G. Davis, Atty. Gen., for the State.

Brief of counsel did not reach the Reporter.

SAYRE, J. [1] The indictment against the prisoner was returned on June 4, 1923, by a grand jury which had been duly organized prior to February 26, 1923, and on the last-named day had been recessed subject to the order of the court. By an order spread upon the minutes of the court, the previously organized grand jury were called into session on June 4th, and on that day, as we have noted, returned the indictment in this cause.

The proceeding thus shown was in accord with the statute (section 8665 of the Code of 1923), and was free from error.

[2] Defendant was on trial for the killing of John L. Knox. The evidence objected to in assignments of error 39 and 40 tended to show threats and expressions of ill will by defendant against deceased, and was properly allowed to go to the jury. The fact that one of these threats was conditional, and that the other was directed against some unnamed person, who is referred to merely as being of canine lineage on the maternal side, did not render them inadmissible. Cribbs v. State, 86 Ala. 613, 6 So. 109; Ford v. State, 71 Ala. 385. , The jury could have found no difficulty in inferring that deceased was the person against whom such threats were intended.

[3] It appeared that defendant, a few moments after he had shot and killed Knox, also fired two shots at one Jernigan, a policeman of the town of Andalusia, and wounded him. There was no error in allowing the sheriff, Livings, to testify that defendant's first remark after he was taken into custody —a few minutes after the killing of Knox and the wounding of Jernigan—was: "That" (referring to Jernigan with an opprobrious epithet) "was the ——— I wanted." This remark showed hostility to Jernigan (Smith v. State, 183 Ala. 25, 62 So. 864) and if defendant, when killing Knox, was venting his hostility against Jernigan, it was well for the jury to be enabled properly to characterize the act, even though the act and its malice were directed against different persons.

[4] Defendant pleaded "not guilty by reason of insanity," as well as "not guilty" and the burden of the evidence introduced by him was directed to the proposition that he was insane at the time. But this was no reason why the question to Livings—who for some time had him in custody, and testified to his behavior during that time—seeking to show that defendant's case was as bad as any he (the sheriff) had ever had in jail, should have been allowed. Comparisons were of no consequence; the only proper question being whether defendant understoood the nature of his act, or, understanding, was unable to refrain from its commission.

[5] Sheriff Livings was properly allowed to state his opinion that defendant was sane at the time of the trial, and had been so since his return from the Insane Hospital at Tuscaloosa, to which, for a time, he had been committed shortly after the killing for which he was on trial. The probative force of this testimony as shedding light on the issue presented of insanity at the time of the killing was a matter for the jury.

[6] Of the three wounds upon the body of deceased, one entered his head through the jaw, another through the back of the neck. Fellows, the undertaker, who prepared the body for burial, testified that two bullets fell

out of the mouth of deceased, and that the two wounds described above went into the mouth of deceased, but not through. This he knew, the inference is, because he, with a physician, probed the wounds. The objection to this testimony was without merit.

[7] Defendant's witness Blair was in jail at the same time with defendant, and helped the jailer care for him. He testified to defendant's condition and behavior during the time, and testified that he was "foolish and crazy." There was no error in allowing the state to have an answer from this witness on cross-examination to the effect that he had pleaded insanity in his own case. The answer tended to show what manner of man the witness was, and the value of his opinion on the subject of defendant's insanity. It was competent on cross-examination.

[8] If there was error in permitting the state to show on what charge Charlie Tillis was confined in jail, as there probably was, even on cross-examination—Tillis having testified to the insanity of defendant on his observation of defendant during that time—such error was corrected as well as it could be by the court on the next day of the trial. This method of curing error has been regarded by this court with cautious disapproval; but a clear instruction to the jury to disregard testimony erroneously admitted in the first instance will ordinarily suffice. Maryland Casualty Co. v. McCallum, 200 Ala. 156, 75 So. 902; Smith v. State, 183 Ala. 21, 62 So. 864; Green v. State, 96 Ala. 32, 11 So. 478; Jackson v. State, 94 Ala. 85, 10 So. 509. In the present case the testimony of the witness was of such relative unimportance, in the great mass of testimony adduced by the defendant, that the court thinks the exception reserved should not be allowed to work a reversal of the judgment of guilt.

[9] George McQueen, a witness for defendant, testified to defendant's erratic behavior on a certain occasion when the witness was trading in the store of deceased where defendant was a clerk. Defendant's offer to show that the witness afterwards mentioned the circumstance to his wife was properly excluded as hearsay.

[10] To ask the witness Fletcher, who undertook to testify to defendant's insanity, and who had had business transactions with defendant while the latter was employed at the packing house, whether he transacted such business in a correct way was permissible on cross-examination.

[11] The hypothetical question as to defendant's mental state, propounded to Dr. Underwood, was properly disallowed, because it did not fairly hypothesize the facts shown in evidence, and seemed to invite the witness' judgment that defendant was insane at the time of the killing, on the ground that another physician had testified that he was insane.

[12] The question put to the witness Mar-

ian Jackson by the defendant, "Why didn't you sleep?" was excluded under the familiar rule in this state that excludes statements of uncommunicated motives, purposes, mental operations, except on cross-examination. It was of trifling importance in any event.

The error, if error, in the state's question to Wiley Kilpatrick, was cured under the rule stated above in respect to the examination of the witness Charlie Tillis.

[13, 14] We think the testimony of Dr. Faulk, who was connected with the Alabama Insane Hospital at Tuscaloosa during the time that defendant was there, to the effect that "he tried to escape," and "he tried to escape at night," was the competent statement of a collective fact, and could in no event work a reversal, since the facts, fully justifying the witness, were stated by this and other witnesses, and were not denied.

[15] Dr. Faulk was an expert on the subject of insanity. He had observed defendant for some months while the latter was at the hospital, and was properly allowed to give his opinion that defendant was feigning insanity.

[16] It was competent for Dr. Blair, who knew defendant and visited him in jail, to state his opinion that on that occasion he saw nothing to indicate defendant's insanity. The action of the trial court admitting this evidence cannot be held for reversible error. Jones v. State, 181 Ala. 63, 61 So. 434.

[17, 18] C. M. Searcy, for the state, was permitted to testify that he had been employed by deceased in the same business with defendant, to state the duties of defendant in that business, his manner of discharging them, and that on the day of the homicide defendant had made a number of entries evidencing transactions by himself; the same being noted by the witness, for the information of the jury, on the books where they were to be found. There was no error in this. Nor was there error in the court's refusal to limit this testimony to the issue of insanity vel non. It was relevant to nothing else, nor was there any other real issue in the cause, nor does it appear that the limitation suggested by defendant would have been anything more than a useless ceremony or of any possible benefit to defendant.

[19] The witness J. C. Coursey testified for the state that he was in the store of deceased at the time, and witnessed the killing of deceased by defendant. Defendant's contention, supported by evidence, was that Coursey, who lived at some distance from Andalusia, where deceased carried on his business, was not in Andalusia or the place of business of deceased on that day, and so that his testimony was false. To meet this contention, and the evidence in support of it, the state was permitted to show that on the date in question Coursey received from Riley an order on deceased for $6 worth of merchandise, and circumstances tending to show that on that day

the witness had been in the deceased's place of business, probably just before and at the time of' the killing, viz. that the order was found on the file kept by deceased, and had been filled on the day after his burial, the store having been closed to business in the meantime—all this without error; and for like reasons the testimony of the witness Riley that he gave the order on the day of its date was relevant and material.

[20] Steve Worthington was a barber. The defense had introduced evidence of some antics by defendant in the barber shop as going to show an unsettled state of mind. In rebuttal of this, it was of course competent for the state to show that a brother of defendant was the person who had engaged in the performances which had been attributed to defendant.

[21, 22] Counsel engaged in the prosecution should not have referred to the fact that defendant had not told the jury whether Coursey was present at the homicide, thus in a way calling attention to the fact that defendant had failed to testify in his own behalf. The statute (section 5632 of the Code of 1923) provides that the failure of a defendant in a criminal case to testify in his own behalf shall not create any presumption against him, nor be the subject of comment by counsel. But the court told the jury that the argument was improper, and that they should not allow it to have any weight whatever in their consideration of the case. We are unable to say that the error of counsel in this case was remediless, or that the court failed to adopt a timely and efficient corrective, and hold therefore that the remark of counsel affords no just ground of reversal.

[23, 24] Charges 1, 2, and 4, requested by defendant, were properly refused. They sought to instruct the jury that they should acquit defendant if they should find him to have been afflicted with a disease of the mind or was "otherwise insane" at the time of the offense charged. This was no proper definition of legal responsibility. Aside from cases in which the defendant is wholly incapable of distinguishing between right and wrong, as applied to the particular act, the insanity which will excuse must be the result of mental disease. Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am. Rep. 193. But these requested charges would have broadened the area of nonresponsibility, and that without any definition of its limits.

[25] Among other faults, charges 3, 5, 6, 9, 10, and 11, refused to defendant, had a decided tendency to lead the jury to accept, as a sufficient excuse for the killing of deceased, that momentary, emotional, or so-called moral, insanity, not associated with mental disease, which has no recognition in the law of this state. Hall v. State, 208 Ala. 199, 94 So. 59; Boswell v. State, 63 Ala. 307, 35 Am. Rep. 20; Parsons v. State, supra.

[26-28] Charge 8 tended to create the impression that defendant might be acquitted on the ground of drunkenness only. It was therefore misleading. The evidence may have justified a finding that defendant was drunk at the time of the homicide, but that would not have excused his act, nor was it clear that defendant was drunk. The jury, under the evidence, might have found that defendant was only slightly under the influence of an intoxicant—a condition not usually spoken of as drunkenness. Charges 20, 21, and 22 were properly refused.

[29] Charge 26 was well refused. The shooting of Jernigan, an officer of the law, followed immediately upon the killing of deceased, and defendant's remark about Jernigan a few minutes later (referred to hereinabove), were competent as illustrating the mind of defendant when shooting deceased, and were properly to be considered in that connection. So as to charge A2.

[30-32] There was no specific burden on the state to prove the fact that the witness Coursey was on the scene of the homicide by testimony other than Coursey's, as charge A seems to assert, and for this reason that charge was refused without error. Charge B was fairly covered by the court's oral charge. The state's case by no means depended upon the testimony of Coursey, and hence charge A1 was refused without error.

[33] Charge A7 was properly refused, for the reason that drunkenness is not insanity, nor is it an excuse for crime. Nor, assuming that defendant was "crazy drunk"—an assumption not supported by the evidence, in our opinion—was that insanity or sufficient excuse. Drunkenness so excessive as to paralyze the mental faculties, rendering one incapable of premeditation or malice, may, in extreme cases, reduce a homicide from murder to manslaughter. King v. State, 90 Ala. 616, 8 So. 856. But that is not the proposition of the charge under consideration.

Charge A8, like charge 8, was misleading. It failed to discriminate between drunkenness and insanity. It tended to confuse the two subjects in the mind of the jury. It was well refused. Like considerations serve to justify the refusal of charges CC and DD.

We are very clear to the conclusion that there was no error in the ruling by which the court denied defendant's motion for a new trial. The evidence furnishes ample justification for the verdict and judgment, and, this being the case, there was of course no error in refusing the general charge requested by defendant.

The record has had due consideration, and we have stated our conclusion as to each exception reserved, at unnecessary length perhaps. We have found no error to reverse.

Accordingly the judgment must be affirmed.

ANDERSON, C. J., and GARDNER and MILLER, JJ., concur.