## Karsner v. Commonwealth.

(Decided October 24, 1930.)

LESLIE W. MORRIS and H. W. ALEXANDER for appellant.

J. W. CAMMACK, Attorney General, S. H. BROWN, Assistant Attorney General, and JOHN J. HOWE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The appellant has been here before; see 196 Ky. 560, 245 S. W. 155. His name is incorrectly spelled there, but we are now correcting that.

About 3:00 p. m. Saturday, February 2, 1929, in the village of Monterey, in Owen county, he shot and killed Raymond Simpson. Two indictments for felony resulted. By No. 3202 he was charged with voluntary manslaughter, and by No. 3203 he was charged with a recidivistic offense of carrying concealed a deadly weapon.

Upon this trial under No. 3202 he was found guilty and his punishment fixed at two years in the penitentiary. As one of his contentions is that he was entitled to a peremptory instruction we shall give a short statement of the facts. Slayer and slain had been neighbors and friends. Not long before this homicide Karsner had bought some tobacco and had taken it to Lexington and delivered it to some loose-leaf warehouse for sale.

712

Simpson saw the tobacco there and bought it from Karsner at a price that gave Karsner a small profit. When market day arrived and the tobacco was sold it failed to bring as much as Simpson had paid for it and Karsner twitted him.

On the day of this homicide Simpson was in Monterey and was drinking. Karsner had come to mill, and, while waiting for his grinding, was walking about the village buying some household supplies. Simpson was engaged in a conversation with some men, and, as Karsner came along, Simpson hailed Karsner, turned to him, laid his hand on his shoulder and said: "What's the matter with your lips? Bramble will fix them up for you all right." Thus referring to a difficulty between Bramble and Karsner, some mention of which is contained in the old case. Simpson's language to Karsner soon became grossly abusive and insulting. His mother came up and pleaded with Simpson to go home. He refused. Karsner said to him, "I have a wife and six children and I do not want any trouble." Karsner backed away, Simpson followed him and with his right hand grabbed him by the lapel of his coat, so some say, others that he grabbed Karsner by the collar and began choking him, then Karsner threw his left hand behind the neck of Simpson and drew him to him; Karsner says he did this to relieve the pressure on his throat. The insulting and abusive nature of Simpson's language became more so, if that is possible for such language. Karsner backed out into the street, Simpson followed, neither released his hold upon the other. Simpson saw a pistol in Karsner's pocket and said "that ——— gun you have, this is one time it will do you no good." The two men struggled for possession of the pistol, Karsner got the better hold upon it, he thrust it against Simpson's left side and fired.

Upon these facts reasonable men might differ, whether this killing was excusable or not, the question was properly submitted to the jury, and, if the court did not err in his rulings on the evidence and the conduct of counsel for the commonwealth, it should be affirmed. We shall now state these matters, but shall preface that statement by saying that Karsner by his counsel objected to all of it, and, when his objections were overruled, excepted to the ruling.

## The Evidence Complained of.

Karsner was asked on cross-examination if on the day following the homicide, when he surrendered to the authorities, he or his brother Al Karsner, in defendant's presence, had not asked the county judge to give him a permit to carry a pistol, to date it back to a date prior to the shooting, and had told the county judge that a good lawyer had advised that he could issue such a permit. Karsner denied remembering this. The county judge testified that in substance such a request and statement was made by either Karsner or his brother, in Karsner's presence.

The commonwealth asked Karsner about a conversation with Nelse Cunningham one day some time after the homicide while he was leading a cow, and asked Karsner this: "I will ask you if during your conversation with Mr. Nelse Cunningham at the time you had that cow there on the road, if, during your conversation, that Mr. Nelse Cunningham asked you how it felt when you killed a man, you responded to him that you felt no more about it than to shoot a cow?" Karsner answered: "Not that way. Mr. Cunningham came out as I was coming along with the cow, he stopped and was talking to me. The cow was hot, it was hot weather, been driving the cow from John Boner's up in Franklin County. He came out and said, 'Hub, how does a man feel when he kills a man?' I said, 'I don't know, Mr. Cunningham, I never killed a man.' He said, 'You killed Raymond Simpson.' I said, 'No, sir, I shot him, he died later.' 'Well,' he said, 'that is the same thing,' I said, 'Absolutely not, Mr. Cunningham.' That was the statement." The date of this conversation was August or September. This is taken from the evidence of Cunningham: "You asked him how a man felt who had shot another, and if he did say in substance, 'In a way, no more than shooting that cow?' Yes, sir."

We shall first refer to the latter conversation. The purpose of the commonwealth in introducing this was to induce the jury to believe Karsner was utterly devoid of proper feeling for his fellow man, and to evidence malice. Such expressions as this, introduced to show callosity of heart as bearing on question of malice, are often admitted against a defendant. See 30 C. J. 159, sec. 375. It would seem, however, they must have been made within a reasonable time after the killing, for exam-

ple here are some instances when such have been admitted, and we have followed these citations with a brief statement of the intervening time: Duncan v. Commonwealth, 12 S. W. 673, 11 Ky. Law Rep. 620 (2 hours); Howard v. Commonwealth, 227 Ky. 142, 12 S. W. (2d) 324 (just a few minutes); Maddox v. State, 159 Ala. 53, 48 So. 689, (20 minutes); Morris v. State, 146 Ala. 66, 41 So. 274 (10 minutes); Henderson v. State, 70 Ala. 29 (6 minutes); Taggart v. Commonwealth, 104 Ky. 301, 46 S. W. 674, 20 Ky. Law Rep. 493 (shortly after the killing); Smith v. State, 183 Ala. 10, 62 So. 864 (10 minutes); State v. Poole, 156 La. 434, 100 So. 613 (60 minutes); State v. Adams, 128 Wash. 419, 223 P. 9 (immediately); People v. Brown, 62 Cal. App. 96, 216 P. 411 (shortly after the shooting); Kilpatrick v. State, 213 Ala. 358, 104 So. 656 (a few minutes after the shooting); State v. Messervey, 105 S. C. 254, 89 S. E. 662 (before victim was buried); Brown v. State, 149 Ark. 588, 233 S. W. 762 (when body of victim was picked up); Ballentine v. State. 169 Ark. 871, 276 S. W. 1002 (when accused was arrested); McManus v. State, 36 Ala. 285 (30 minutes); State v. Albanes, 109 Me. 199, 83 A. 548 (24 hours); Bowman v. U. S., 59 App. D. C. 90, 267 F. 648 (night after the homicide).

The last two cases are the longest spaces of intervening time between the homicide and the making of the admitted remark, we have found; except the domestic case of May v. Commonwealth, 153 Ky. 141, 154 S. W. 1074. In that case five conversations are detailed in the evidence, all of which come within the scope of the question under consideration. The court in stating the evidence against May sets out these statements, but nothing further is said about them in that opinion. We have examined that record and have read the evidence in that case as well as the briefs, and we find there was no objection to this evidence at any time or attack made upon it further than an attack upon the reputation of the witness Speed Bryant. Thus there was no occasion in that case for the court to pass upon the admissibility of such evidence, and from an examination of the opinion it will be seen the court did not do so, and that opinion is of no help in passing on the question before us. Such statements are admitted as bearing on the question of malice. The guilt or innocence of Karsner is to be measured by the appearances to him at the time of the shooting and his good faith belief then in the necessity therefor, in the exercise of a

reasonable judgment. Evidence of malice then entertained by Karsner would be admissible, and his statements showing callosity of heart then or shortly thereafter made would be competent evidence, but it would seem that such remarks to be admissible must be shown to have been made within a reasonable proximity to the homicide; and this remark made more than six months after this homicide, if made at all, was certainly entirely without all possible range of admissibility.

Mr. Wigmore, in his work on evidence, vol. 1, sec. 395, treats of such expressions as these under the heading "Prior and Subsequent Emotion." In his discussion he says: "The existence of the same emotion at a prior or at a subsequent time can enter only as evidential of its existence at the time in issue; and then is presented the question how far it is thus evidentially available. . . . The peculiar opportunity for error here is that prior existing emotion may have been brought to an end before the time in issue, and that the subsequent emotion may have been first produced since the time in issue." Human emotions change. Some almost trifling occurrence may destroy a friendship of long standing and establish an enmity in its stead, and bitter enmities are often forgotten and succeeded by cordial friendships. Love and hate are the strongest of all emotions, yet they do not perdure. Men may today hate persons they loved six months ago and vice versa. Such changes in emotion are of such common occurrence, this court cannot say they are unknown to it.

All statements made in the full blaze of the homicide by either of the participants are parts of the res gestae and admissible either for or against the accused. Beyond the blaze of res gestae, there is a twilight zone in which any statement made by the accused may be used not for but against him, as an admission or declaration against his interest, whether it relates to his emotions or relates to when, where, how, why, by whom, etc., the homicide was done, but beyond this twilight zone there must come a time when statements by the accused relative to his emotions will not be admissible because made at such a length of time from the homicide that it is no longer reasonably inferrable that he had those same emotions then. It is this that renders a statement about emotion, made after lapse of considerable time, inadmissible, whereas statements against his interest made by an

accused, relating to when, where, how, why, by whom, etc., the deed was done may be admitted no matter when made.

In the light of this let us notice the question propounded to Cunningham and his answer: "You asked him how a man felt who had shot another, and if he did say in substance, 'In a way no more than shooting that cow?' Yes, sir." Thus Cunningham's evidence does not show Karsner felt that way about it when he did the killing, but that he so felt about it at the time of this conversation, six months afterwards. Karsner may have had no such feeling when he did this killing, yet as time went on, as he battled for the existence and subsistence of himself and family, a battle complicated by the expense of employing counsel, the preparation of his defense, the attitude of Simpson's family, their efforts, and aid given to prosecute him, all of which he had reason to feel was thrust upon him by the act of Simpson in stopping him and beginning the difficulty, which all the witnesses say Simpson did, Karsner, after brooding over his troubles, may have come to feel even as Cunningham makes him say he felt, and yet he may not have so felt at the time of the tragedy. This is the very danger Mr. Wigmore so ably points out.

It is proper the jury should know what were the emotions of the accused at the moment he did the killing, for the jury is charged with the difficult task of viewing the situation as Karsner saw it, as he struggled with his infuriated adversary, and then saying whether he shot Simpson needlessly in heat of passion, as defined in the instruction on manslaughter, or shot him in his necessary self-defense, as defined in the instruction on that subject. While it is seeking a solution of such questions, the way should not be opened for the jury to enter the field of conjecture, which the admission of this evidence did by giving the jury an opportunity to guess that, because Karsner so felt in the latter part of August, he felt the same way about it on February 2d.

We will now return to the conversation relative to the permit to carry a pistol. This should not have been admitted. Men should be tried for their offenses one at a time. Slone v. Commonwealth, 230 Ky. 199, 18 S. W. (2d) 1005. Ordinarily evidence of other crimes is irrelevant and inadmissible. See Cook v. Commonwealth, 232 Ky. 613, 24 S. W. (2d) 269. There are exceptions to

this rule as pointed out in the Cook case, but this evidence in question comes within none of the exceptions. The court erred in admitting it.

We have called attention to the fact that this record discloses Karsner has a felony charge against him for carrying this pistol, and it was perhaps the fear of such a charge that induced the defendant's brother to discuss this pistol permit with the county judge.

### MISCONDUCT OF ATTORNEYS.

After the prosecuting attorneys had led the court into error and secured the admission of this evidence then they seized onto it, they took it as their text, and we have taken these remarks from among those which the judge certifies they used:

"Mr. Howe further stated to the jury in the course of his argument: 'That Vincent Johnson was the one that wanted to put the pistol back in his hand and did put the pistol back in his hand, and it has been in this man's hand ever since; it was not produced here, it was not turned over to the commonwealth, although a permit has been asked and refused by Judge Howard Ellis, while apparently the gentlemen representing the accused in this case expect the jury to give this man a permit to carry a pistol and date it back and let him continue to carry it so it will be dated in the future for all time in order that he may go over to Monterey bull-ragging and bulldozing the people there with a pistol in his pocket, bragging about the fact that he doesn't want to have any trouble because he has a wife and six children.'

"In the course of the argument of Honorable Ward Yager, he made the following statement to the jury:

" 'Gentlemen of the jury, one of the strongest things to me in this case is that occurrence in the County Judge's office when he (Karsner) was trying to get his defense in order. He was forced, or thought he would be forced or called upon to account for having carried that pistol; and he even asked the County Judge if he would issue him a permit to carry that pistol, or his brother did in his presence and date it back to a day before the shooting.

Why did he want that permit dated back before the day upon which Raymond Simpson was shot? To show his feeling in the matter; look at what he said there to Nelse Cunningham about shooting a cow, "that he felt no different than if he had shot a cow." ' "

The attorney who prosecuted this man in the trial court has briefed the case here. He cites Denham v. Commonwealth, 119 Ky. 508, 84 S. W. 538, 27 Ky. Law Rep. 171, which holds that evidence of a robbery committed at the time of an assault is admissible as a part of the res geste, but it is a far cry from res gestae to a disconnected conversation the next day. He quotes from Helton v. Commonwealth, 84 S. W. 574, 27 Ky. Law Rep. 137: "On a trial for killing a person *everything done* at the time, etc., is admissible," but certainly that does not include a conversation the next day. He cites Romes v. Commonwealth, 164 Ky. 334, 175 S. W. 669, and Richardson v. Commonwealth, 166 Ky. 570, 179 S. W. 458, as authority for the admission of this pistol permit episode, but they are against him.

He cites Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714, 33 Ky. Law Rep. 831, 894; May v. Commonwealth, 153 Ky. 141, 154 S. W. 1074; O'Brien v. Commonwealth, 115 Ky. 608, 74 S. W. 666, 24 Ky. Law Rep. 2511; and Thomas v. Commonwealth, 185 Ky. 226, 214 S. W. 929; all of which are valuable opinions, but the do not, as we see it, bear on the question before us.

Hall v. Commonwealth, 189 Ky. 72, 244 S. W. 492, 495, is cited, but that was a case dealing with evidence of an effort to suppress evidence, but in this conversation with the county judge no effort was made to suppress evidence. If it were possible for Karsner to have procured such a permit, antedating the killing, it would not render him any less or any more culpable for this homicide. It has no bearing on his guilt or innocence of the crime for which he was on trial. The Attorney General, in his brief defending the admission of this evidence, says it was a part of the res gestae, the answer to which is it occurred next day.

The courts have uniformly condemned all efforts on the part of the accused to suppress, destroy, or conceal the evidence against him, but this is not such.

The charge against Karsner was voluntary manslaughter; he admits the homicide and pleads he had to do it in his necessary self-defense. The issue is simple. This evidence bore on it in no way. Whether Karsner had or had not a right to carry a pistol is not in issue. He was not being tried for carrying a pistol. The admission of this evidence did the very thing condemned in Brashear v. Commonwealth, 178 Ky. 499, 199 S. W. 21, it tended to prejudice the minds of the jurors against him, and to make it easier for them to believe him guilty of the crime for which he was being tried. If it does not do this, then the commonwealth will not be hurt by its exclusion, and, if it does do this, then the defendant was prejudiced by its admission, for his guilt or innocence (malice not being involved) is determined, not by whether he had a right to have a pistol or not, but by whether it appeared to him in the exercise of a reasonable judgment that he was in such danger of death or great bodily harm, as to induce him in good faith to believe that nothing less than the slaying of his adversary would avert that danger.

Against the argument of the prosecuting attorneys and the cases they have cited, we will place the folowing: Slone v. Commonwealth, 230 Ky. 199, 183 S. W. (2d) 1005; Cook v. Commonwealth, 232 Ky. 613, 24 S. W. (2d) 269; Brashear v. Commonwealth, 178 Ky. 499, 199 S. W. 21; Coleman v. Commonwealth, 204 Ky. 652, 265 S. W. 1; Maiden v. Commonwealth, 225 Ky. 673, 9 S. W. (2d) 1018; Romes v. Commonwealth, 164 Ky. 334, 175 S. W. 669; Avery v. Commonwealth, 223 Ky. 248, 3 S. W. (2d) 624; Barnes v. Commonwealth, 219 Ky. 38, 292 S. W. 492.

While the use of the language quoted from the arguments of the prosecuting attorneys must be disapproved by us, yet it does not reflect upon them, as the court had admitted the evidence, and it was their duty to use every honorable effort, in presenting the admitted evidence, to secure a conviction. They erred in using this argument, but it was a reflected error, for which they are excusable. The basic error was committed when they led the court into admitting this evidence; the error in the arguments grew out of that.

As a result of the admission of the evidence criticized, and the prominence given thereto by the prosecution, the minds of the jurors were led away from the

real issue and the accused was tried upon a false issue thus injected. His substantial rights were prejudiced thereby and his motion for a new trial should have been sustained.

The judgment is reversed.

DISSENTING OPINION BY CHIEF JUSTICE THOMAS.

The law demands, and civilized society is entitled to, the enforcement of the criminal laws, regardless of immaterial errors, to the end that property rights, life, liberty, and the peace and good order of society may be protected and maintained; and, believing that this court has departed from sound principles in holding that the trial court prejudicially erred in admitting the two items of evidence complained of and in reversing the judgment for such reasons, I feel impelled to register my dissent therefrom.

The evidence concerning the permit from the county judge for defendant to carry concealed weapons was a plain effort to manufacture evidence in his behalf by seeking to relieve him of whatever odium might attach because of his having a pistol concealed upon his person at the time of the homicide; he, no doubt, believing that, if he had such permit, it would be a justification and relieve him from the appearance of an outlaw, or of having prepared for an anticipated combat.

The opinion rejects the evidence concerning defendant's remark on the occasion of his driving a cow some months following the homicide, solely upon the ground that the proven statement of appellant was too far removed from the time of the homicide, and the domestic cases of Duncan v. Commonwealth, 12 S. W. 673, 11 Ky. Law Rep. 620; Taggart v. Commonwealth, 104 Ky. 301, 46 S. W. 674, 20 Ky. Law Rep. 493; and Howard v. Commonwealth, 227 Ky. 142, 12 S. W. (2d) 324, with the text in Wigmore on Evidence, volume 1, sec. 395, are cited in support thereof, and also a list of cases from other jurisdictions, the latter of which I have not examined, but I am confident that an examination of them would reveal the same inapplicability as I have found to exist with reference to the above-named domestic cases and to the text of Mr. Wigmore.

In the relied on Duncan and Howard cases from this court there was no question involved such as we have

here, relating to the admissibility of *statements* of defendant himself. In those cases the questioned evidence related to certain *conduct* of defendant, removed in point of time from the principal transaction, the purpose of which was to make it possible for the jury to infer and find what was the motive, intention, and purpose of the defendant on trial at the remote passed occasion of the commission of the crime for which he was being tried, i. e., the state of his feelings toward his victim at that time, and his real purpose in the commission of the crime for which he was being tried. They were independent and collateral transactions involving a course of conduct of defendant from which, if not too far removed, the jury might deduct facts necessary to establish guilty intent so as to convert the acts with which he was charged from an innocent into a guilty purpose on his part. Similar collateral and independent *acts* and *conduct* were also the subject-matter being discussed by Mr. Wigmore in his text quoted and relied on in the opinion. Neither in the domestic cases nor in the text of Mr. Wigmore, were any *express statements* (requiring no deductive reasoning for their meaning) from the mouth of the accused involved. The reason why *acts and conduct* of the accused (greatly removed in point of time) are held to be irrelevant is, as is pointed out, that because of such remoteness, the jury might be led into error and visit injustice upon the defendant by an erroneous conclusion drawn therefrom concerning the condition of defendant's mind at the time of the commission of the principal crime for which he was being tried. In other words, that there is great possibility for misinterpretation.

An altogether different question, however, is presented when there emanates from the mouth of the accused statements which speak for themselves and which portray the attitude of defendant's mind towards his victim, since in such case he (himself) communicates that attitude, and it is not left to interpretation, or deduction, or to be inferred by the jury from any independent and collateral conduct of the defendant, which might or might not have a bearing upon such attitude, dependent upon the length of time intervening between the principal fact and the occurring of such collateral matters. It was of the latter that this court was dealing in the Duncan and Howard cases, and also of which Mr.

Wigmore was treating in the text to which the opinion makes reference.

In his section 394, just preceding the one referred to in the opinion, and as a premise for the discussion of the general subject the author was then treating, he says: ''Every one of the human qualities or conditions with which the foregoing chapters have been concerned may be evidenced by *conduct* exhibiting it. The *interpretation* of that *conduct* proceeds always from experience as to the *inferences to be drawn* from particular kinds of conduct. Questions of evidence rarely arise over such inferences, so far as the evidence of Emotions is concerned, probably because these *interpretations* are fairly plain and indubitable.'' (My italics.) It will thus be seen that the exclusion of evidence to prove such collateral and independent *conduct* (the only purpose of which is to permit the jury to draw inferences or deductions therefrom), when its occurrence was too remote from the principal fact, is a precautionary rule for the protection of the accused against probable erroneous inferences concerning his mental attitude toward his victim at the time the alleged crime was committed. But, surely that same rule of remoteness, rendering that character of testimony incompetent, would not apply to a *statement* or *admission* made by the defendant himself and which is an express portrayal by him of his condition of mind and of his feelings toward his victim. The latter is everywhere admitted, howsoever far removed from the principal transaction, as an admission or declaration by defendants against his interests. Being his own expressions they are always admissible howsoever far removed in point of time from the date of the commission of the offense of which he is accused and for which he is being tried. They involve no deductive reasoning or drawing of inferences, as is the case when only collateral conduct of the defendant is involved. Nor are such direct admissions and statements from defendant to be excluded because of their contents when there is no doubt as to the subject-matter to which they refer. So that, such a statement is competent and admissible, notwithstanding it may not embody a *direct* and *positive* admission, if the language employed is susceptible to no other reasonable interpretation than a guilty one, and which I may illustrate by a reference to the alleged incompetent evidence now under consideration. If defendant had said in this

case, though at a remote time from the killing, that "I entertained malice toward my victim" (it being probable as well as impossible for it to generate after his victim was dead), there would be no doubt of its competency, howsoever far removed from the killing; but any other express statement not so direct but tending to prove substantially the same attitude and feeling toward his victim is for the same reason equally competent, and from which it will be seen only a question of interpretation by the court is involved. If the statement, though indirect, as is true here, necessarily points to defendant's callous and indifferent condition of mind toward his victim, it is admissible as a statement against interest the same as if it was positive and direct. It is, therefore, my conclusion that the opinion, in excluding the proven remarks of defendant on the occasion of his driving his cow, proceeded upon a wholly inapplicable principle of the law of evidence, and thereby ignored the well-settled and undeviating rule that an admission by a litigant against his interests, howsoever far removed from the principal transaction, is always competent against him.

The Taggart case involved the question of the admissibility of a proven statement made by defendant some short while after he committed the homicide for which he was being tried, and it was objected to, not on the ground of remoteness, but because its *subject-matter* did not point to defendant's guilt, or to the establishment of any fact as an element of his guilt, but this court held otherwise and admitted it. It is true that in the opinion it is stated that the statement was made "shortly after the shooting," but, clearly that statement in the opinion was not made at bearing upon the admissibility of the evidence, but was employed by the court in giving a history of the case. The court held that the involved statement was competent, not because it was recently made, but because, as said in the opinion, "the evidence bore solely on the appellant's state of feeling toward the deceased, and conduced to illustrate his animosity toward him." So that the objection there was not upon the ground of remoteness, but was one that related to the *subject-matter* of the statement, i. e., whether its language was or not expressive of the speaker's feeling toward the deceased. The court, as we have said, held that it was, and, being so, it was a declaration against interest and would be admissible regardless of the inter-

vening time between its making and the crime to which it related.

If the opinion is to be adhered to, then all guilty statements of the defendant on trial, if made, as in this time of the commission of his crime, are incompetent *solely* because of remoteness, and which is the announcement of a doctrine that is a stranger to me, and with which I have not heretofore met in my experience as a practitioner as augmented by my experience as a member of this court. If the testimony in this case related to some independent act or conduct of defendant, perpetrated six months after the homicide with which he is charged, and its only purpose was to afford the jury an opportunity to interpret that act or conduct so as to draw an adverse inference against him, then, perhaps, the doctrine announced in the opinion would apply. But, I repeat, we have no such case as that, and for that reason I am convinced that the evidence was competent for whatever it was worth. If, however, I should be mistaken in my position, I am convinced that the proving of the statement now under consideration, though erroneously introduced, did not prejudice defendant's substantial rights, and was not an error of sufficient magnitude to require a reversal of the judgment.

I therefore most respectfully dissent from the opinion.